**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

THE ESTATE OF JOSEPH ROBERT
LAFARGE, BY AND THROUGH ANGELA
BLIZZARD, ADMINISTRATRIX                                    PLAINTIFF

v.                                                  CIVIL ACTION NO. 1:08CV185

KEITH KYKER, M.D.; BARRY BERTOLET,
M.D.; and CARDIOLOGY ASSOCIATES OF NORTH
MISSISSIPPI, P.A.                                             DEFENDANTS

<u>**MEMORANDUM OPINION**</u>

On July 25, 2008, Plaintiff Angela Blizzard, as the personal representative and conservator of Bobby J. LaFarge, filed a medical malpractice claim against Defendants Keith Kyker, M.D. and Cardiology Associates of North Mississippi. LaFarge was admitted to North Mississippi Medical Center ("NMMC") on May 31, 2006, where he suffered a cerebrovascular incident on June 4, 2006. Blizzard contends that Defendants breached the standard of care with respect to the treatment of LaFarge, resulting in an increased risk of a thromboembolic event and causing the cerebrovascular incident on June 4, 2006.

A trial was held in May 2011, and the jury rendered a verdict finding for the Defendants. Specifically, the jury found that (1) the Defendants did not commit medical negligence, as the applicable standards of care were met, and (2) Dr. Kyker obtained appropriate informed consent with respect to the flutter ablation procedure performed on LaFarge. Before the Court now is Plaintiff's Motion for Judgment as a Matter of Law, or, In the Alternative, for a New Trial [175]. Also before the Court is Defendants' Motion for Sanctions, Attorneys' Fees, Costs and Expenses

Against Plaintiff's Counsel [194]. After reviewing the motions, responses, rules, and authorities, the Court finds as follows:

## **LEGAL STANDARD**

### A. Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure sets forth the standard for granting judgment as a matter of law:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue . . . In ruling on a renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct entry of judgment as a matter of law.

FED. R. CIV. P. 50(a)(1), (b).

In applying this standard, the court must consider all of the evidence in the light most favorable to the nonmovant, drawing all reasonable factual inferences in that party's favor, and leave credibility determinations and the weighing of evidence to the jury. McCrary v. El Paso Energy Holdings, Inc., 209 F. Supp. 2d 649, 651 (N.D. Miss. 2002) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). The court should grant a motion for judgment as a matter of law only when "the facts and inferences point so strongly and overwhelmingly in favor of [the moving] party that the court believes that reasonable [jurors] could not arrive at a contrary verdict." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969).

In considering a Rule 50(b) motion for judgment as a matter of law following a jury verdict, the court must be "especially deferential" to the jury's findings. Brown v. Bryan Cnty, 219 F.3d 450, 456 (5th Cir. 2000). The Fifth Circuit's standard for evaluating a Rule 50(b)

motion for judgment as a matter of law following a jury verdict is whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." <u>Am. Home Assur. Co. v. United Space Alliance</u>, 378 F.3d 482, 487 (5th Cir. 2004). A jury verdict must stand unless there is lack of substantial evidence, viewed in the light most favorable to the successful party, to support the jury's factual findings, or the legal conclusions implied from the jury's verdict cannot, in law, be supported by those findings. <u>Id.</u>

B.  New Trial

The Federal Rules of Civil Procedure permits a trial court to grant a new trial based on that court's appraisal of the fairness of the trial and the reliability of the jury's verdict. FED. R. CIV. P. 59. The rule does not specify what grounds are necessary to support such a decision, but states only that the action may be taken "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A); <u>see also</u> <u>Smith v. Transworld Drilling Co</u>., 773 F.2d 610, 613 (5th Cir. 1985). A new trial may be granted, for example, if the district court finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in the course of the trial. <u>See</u>, <u>e.g.</u>, <u>Eyre v. McDonough Power Equip., Inc</u>., 755 F.2d 416, 420-21 (5th Cir. 1985); <u>Westbrook v. Gen. Tire and Rubber Co</u>., 754 F.2d 1233, 1241 (5th Cir. 1985); <u>Carson v. Polley</u>, 689 F.2d 562, 570-71 (5th Cir. 1982); <u>Martinez v. Food City, Inc</u>., 658 F.2d 369, 372-74 (5th Cir. 1981); <u>Conway v. Chem. Leaman Tank Lines, Inc</u>., 610 F.2d 360, 363 (5th Cir. 1980).

## ANALYSIS AND DISCUSSION

A.  Legally Sufficient Expert Testimony

Plaintiff begins by asserting that, during trial, there was no legally sufficient expert testimony to support a defense verdict.  Plaintiff alleges several reasons to support her contention that the expert testimony was legally insufficient.[1]

*Failure to Comply with Federal Rule of Evidence 702*

Plaintiff begins by alleging that Dr. Kyker's testimony on direct did not comply with Rule 702.  Defendants counter and assert that not only did Kyker's testimony comply with all applicable evidentiary rules, but Plaintiff has also waived any such challenge to the testimony under Rule 702. The Court agrees with Defendants and finds that there was legally sufficient expert testimony to support a defense verdict.

At the outset, the Court notes that many of Plaintiff's arguments appear to, in actuality, be belated attempts to challenge the admissibility of Defendants' experts' opinions under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), rather than challenges, as Plaintiff contends, to the sufficiency of the evidence. As Defendants point out, Plaintiff never once objected to the admissibility of Defendants' experts' testimony; thus, any such type objection "has been forfeited." SEC v. Snyder, 292 F. App'x 391, 400 n.1 (5th Cir. 2008) (citing Foradori v. Harris, 523 F.3d 477, 508 (5th Cir. 2008)).  Nevertheless, as the Fifth Circuit noted in Snyder, in order to determine whether there is legally sufficient evidence to support a jury verdict, the court looks "to the basis of the expert's opinion, and not the bare opinion alone." 292 F. App'x at 400 n.1 (internal citations omitted).  But, "review of expert testimony for sufficiency of the evidence is not as rigorous as it would be under a properly preserved challenge to the admissibility of the testimony

---

[1] Given the interrelatedness, some of Plaintiff's contentions are discussed in tandem.

under Daubert." Id. (citing In re Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1132-33 (2d Cir. 1995)).[2]

It is important to note from the beginning that Plaintiff never once makes an argument that Dr. Kyker was not qualified under Federal Rule of Evidence 702. In fact, Dr. Kyker was tendered and accepted by the Court (and the Plaintiff) as an expert on the standard of care applicable to an electrophysiologist in the care and treatment of a patient such as LaFarge in May and June of 2006. Instead, Plaintiff asserts that Dr. Kyker did not "identify" or "explain" what the standard of care was as it applied to LaFarge. Yet, Dr. Kyker – on multiple occasions – addressed the standard of care as it applied to whether Dr. Kyker was required to anticoagulate LaFarge both before and/or after the ablation procedure.

---

[2] Plaintiff also alleges that Dr. Kyker, under Rule 702, was *required* to rely on literature (i.e., independent journals, treatises, or studies) to support his opinions. However, as the Fifth Circuit noted in its analysis of Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999),

> [I]t is appropriate for the trial court to consider factors other than those listed in Daubert to evaluate the reliability of the expert's testimony. In this case, the expert's testimony is based mainly on his personal observations, professional experience, education and training. The trial court, therefore, must probe into the reliability of these bases when determining whether the testimony should be admitted. The Advisory Committee notes to Rule 702 specifically contemplate this approach:
>
> > Nothing in this amendment is intended to suggest that experience alone-or experience in conjunction with other knowledge, skill, training or education-may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. FED. R. EVID. 702 advisory committee's note.
>
> > Likewise, in Kumho Tire, the Court explained that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Kumho Tire Co., 526 U.S. at 156, 119 S. Ct. 1167.

Pipiton v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002). To any extent Plaintiff makes this argument as to defense experts other than Dr. Kyker, the same rationale is applicable.

Dr. Kyker began by asserting that his recommending an atrial flutter ablation for LaFarge met the standard of care. He explained LaFarge's symptoms, testifying that "when you have heart failure, weakness of the heart, blocked arteries, you're 72-years-old, diabetes, and your heart rate goes that fast [i.e., 170 beats per minute], you can't stand it, not for any length of time." Dr. Kyker then proceeded to address Plaintiff's arguments concerning anticoagulation. Dr. Kyker first addressed whether anticoagulation was required prior to the ablation procedure. Dr. Kyker testified that withholding anticoagulation met the standard of care, and he explained as follows:

> When you have a patient who is as sick as Mr. LaFarge is, you've got to help him. You've got to help him and you've got to help him that day. He's Class IV congestive heart failure. That's the worst class there is, and to delay that would be risking him dying.
>
> You know, you don't know what is going to happen, but you know that in the week prior, he's gone downhill in a hurry. You've got him tell you that. You've got his complaints. You've got the tests that are showing his heart rate going down, and now you've got the reason for that. To send him out for 3 weeks in that condition is not appropriate.

Dr. Kyker further addressed the standard of care as it applied to anticoagulation following the ablation procedure. Dr. Kyker testified that a urinalysis obtained on May 31, 2006, confirmed that LaFarge had blood in his urine. Further, Dr. Kyker consulted a urologist who confirmed LaFarge's bleeding. Due to this, Dr. Kyker testified that he could not continue LaFarge on Coumadin, as Coumadin is a "contraindication" for an actively bleeding patient.

At trial, and in response to many of Defendants' experts' contentions, Plaintiff read medical practice guidelines into the record. These guidelines are published by the American College of Cardiology and the American Heart Association. Plaintiff contends that these guidelines set forth the applicable standards of care and "clearly required Dr. Kyker to anticoagulate Bobby before and after the ablation procedure." Yet, as Defendants point out, the

guidelines are indeed just "guidelines." Plaintiff's expert, Dr. Friedlander, acknowledged this during his trial testimony:

> Q: The standard of care is not a single follow the yellow brick road path. It's not a – it's not a guideline that you can turn to and say, this is what I do here. You've got to exercise medical judgment.
>
> A: That's correct.
>
> Q: It's not just as easy as going to a ACC Guidelines 2001, page 57, here we go. Certainly those are given to aid you in caring for the patient, but that's not a recipe or cookbook as to how to treat a patient?
>
> A: That is correct.
>
> Q: And you would agree with that?
>
> A: Absolutely. That's what physicians have to do. They have to piece all of those information together.

Plaintiff contends that Dr. Kyker failed to follow the guidelines, thus breaching the applicable standard of care. Yet, in regards to anticoagulation prior to the ablation procedure, Dr. Friedlander testified that the guidelines contemplate a situation in which such a procedure would be performed without therapeutic anticoagulation:

> Q: You would agree that under the guidelines that have been addressed, there are occasions in which it is appropriate to proceed with a procedure such as an atrial flutter ablation in the absence of therapeutic anticoagulation?
>
> A: There are. Yes. I would actually like to amend that and say that I think that there actually are times when intervening on a rhythm can be an emergent issue and you should do so. A flutter ablation, it's tough to actually come up with an emergent reason to do that kind of intervention, but it's possible –
>
> Q: Yes, sir.
>
> A: So, I would say yes.
>
> Q: And if I use the term emergent, I apologize – I don't – I did not mean to do that. What I'm asking you, Dr. Friedlander, is that under the guidelines there are times that a physician such as Dr. Kyker and Dr. Bertolet may exercise their medical judgment to proceed with a procedure regarding an arrhythmia in the absence of anticoagulation.
>
> A: I suppose that would be true, yes.
>
> Q: Yes, sir. The guidelines speak to that?
>
> A: Yes.

Further, Dr. Kyker testified that his performance of the ablation procedure in the absence of anticoagulation actually complied with the guidelines, as the guidelines note that anticoagulation

is not required when the patient has been in an abnormal heart rhythm less than 48 hours.

Defendants' expert, Dr. Bertolet,[3] reiterated this point during cross-examination:

> Q:     Cardioversion, electrical, chemical or by ablation, thus should be considered only if the patient is anticoagulated, INR equals 2 to 3, the arrhythmia is less than 48 hours duration, or transesophageal echocardiography shows atrial clots. Did I read that correctly?
>
> A:     You did. And because this arrhythmia was less than 48 hours, we fell within those guidelines you just read.

Similarly, Dr. Kerlan also testified that under the guidelines, the ablation procedure in the absence of anticoagulation was appropriate.

The same is true for anticoagulation post-procedure. As for anticoagulation after the ablation procedure was performed, it is important to point out what was not disputed at trial.

_____

[3] Plaintiff asserts that "Dr. Bertolet was qualified to opine that he appropriately referred Bobby to Dr. Kyker, **but that was all.**" (Emphasis added).  However, Defendants tendered and the Court accepted, without objection from the Plaintiff, Dr. Bertolet as an expert on the following:

> We would tender Dr. Bertolet as an expert in the field of interventional and general cardiology as one knowledgeable of and familiar with the standard of care in performing heart catheterizations, including the calculation of ejection fractions for patients undergoing a heart catheterization, interpreting an EKG, and the diagnosis, care and treatment of patients with abnormal or irregular heart rhythms, and the diagnosis, care and treatment of patients with congestive heart failure.

Plaintiff also generally states that the "fallacy of Dr. Bertolet's ejection fraction opinions were exposed by the learned treatise Atrial Fibrillation: Mechanisms and Management." Yet, Dr. Bertolet addressed both Plaintiff's arguments and the treatise in question during his trial testimony:

> Q:     And then next we've got this book (Atrial Fibrillation: Mechanisms and Management) by these different authors. You talk a lot about ejection fraction. The authors of this particular authoritative treatise say that the use of an ejection fraction or fractional shortening NAF is probably best avoided. Did I read that correctly?
>
> A:     Yes, sir. And again, for this patient, he did not have atrial fibrillation – at the time that we were doing this, he was in – I'm not quite sure what rhythm he was when we did the ventriculogram – both atrial flutter or atrial – or sinus rhythm. That is regular rhythm. The thing with atrial fibrillation is that the heart rate is irregular and chaotic, and because of that, that's why you can't calculate the ejection fraction. So, that would not apply to this individual.

First, it was undisputed that, in most situations, a patient should receive three to four weeks of anticoagulation after an ablation. It was also undisputed that Dr. Kyker in fact issued an order for LaFarge to resume his Coumadin after the ablation procedure. What was disputed, however, is whether Dr. Kyker's decision to subsequently hold LaFarge's Coumadin met the relevant standard of care. As noted above, Dr. Kyker testified that he made a medical judgment to hold Coumadin in light of LaFarge's active genitourinary bleeding. Dr. Kyker also testified that this decision met the standard of care. Dr. Kyker, Dr. Friedlander, and Dr. Kerlan all provided testimony stating that giving Coumadin to an actively bleeding patient is contraindicated. Dr. Friedlander conceded that he had no factual basis to dispute Dr. Kyker's testimony that he observed significant bleeding in LaFarge's catheter bag, and Dr. Kerlan supported Dr. Kyker's testimony that to hold the Coumadin following the ablation met the standard of care. Given all of this, and after thoroughly reviewing the entirety of all trial transcripts and notes taken contemporaneous therewith, the Court finds that there was legally sufficient and reliable expert testimony presented in this case.

*Dr. Kyker's Knowledge of the Standard of Care*

Plaintiff asserts that Dr. Kyker was not familiar with the standard of care applicable in this case. This argument is unfounded. Dr. Kyker testified as follows:

> Q:      Dr. Kyker, based upon your background, your training and your experience, are you familiar with that degree of reasonable care, competence, prudence, skill and diligence practiced by minimally qualified electrophysiologists practicing in the United States in May and June 2006 and providing care and treatment to patients such as Mr. LaFarge?
>
> A:      Yes sir, I am.
>
> Q:      Are you familiar with the standard of care applicable to you, Dr. Kyker and the diagnosis, care and treatment of irregular heart rhythms?
>
> A:      Yes sir, I am.

Q:      Are you familiar with that standard of care for the indications for the performance of an atrial flutter ablation such was performed on Mr. LaFarge on May 31, 2006?

A:      Yes sir.

Q:      Are you familiar Dr. Kyker with that standard of care for obtaining informed consent for a flutter ablation procedure?

A:      Yes sir, I am.

Q:      Are you likewise familiar, Dr. Kyker, with the standard of care for making – in making medical judgments regarding the indications and contraindications for the use of anticoagulants such as Coumadin in a patient like Mr. LaFarge in May and June 2006?

A:      Yes, sir.

Plaintiff's argument mainly centers around questioning stemming from cross-examination of Dr. Kyker, wherein Dr. Kyker at one point referred to standard of care as a "legal term." Interestingly, when stating such, Dr. Kyker was not even being questioned about his actions in this case; instead, he was questioned at length concerning the standard of care applicable to one of his partners, Roger Williams, M.D., regarding an order that Dr. Williams issued for LaFarge.

Dr. Kyker testified as follows:

Q:      Are you agreeing that he failure to do so (order more medication for Mr. LaFarge) breached the standard of care?

A:      Mr. Thomas, that's a legal term that we – I frankly don't sit around and consider a lot as far as one individual note. I'll confess that I – this conversation is very difficult, because you're using terms that Dr. Williams and I don't talk about on an individual patient. I will acknowledge to you, for the sake of this conversation and testimony, that based upon the limited note and the information you provided me, he needed some more help at that time.

Q:      Do you understand what the term "standard of care" means?

A:      Yes. But I've never had anybody focus it on one minute at 5:00 a.m. – I've just – the standard of care regarding treatment, I've never had it focused the way you're focusing. I think Mr. LaFarge needed more medication based on that note.

Q:      Dr. Kyker didn't you testify this morning about whether your acts in treating Mr. LaFarge complied with the standard of care? Didn't you give quite a few opinions on that?

A:      Yes, sir.

*Q:      And now you're telling this jury that you don't know what standard of care means because it's a legal term?*

10

> A:      *No, I'm not saying that at all. I'm not saying that at all. You're asking me about one nurse's note that I wasn't involved in. I didn't participate in that conversation. And you're trying to make me say that my partner did something wrong, and I wasn't involved in that particular conversation. You know, I would love for you to talk to Dr. Williams about that.*
>
> Q:      *Dr. Kyker, two minutes ago, didn't you testify in this courtroom that the standard of care was a legal term that you didn't know what it meant?*
>
> A:      *No, I didn't say that.*

(Emphasis added). Upon viewing the testimony in its entirety, there is no evidence anywhere in the record that Dr. Kyker did not know – or testified that he did not know – the standard of care applicable to his actions in the treatment of LaFarge. Plaintiff's arguments are thus not well taken.

*Dr. Kerlan's Expert Opinions and Testimony*

Plaintiff next makes several arguments concerning the trial testimony of Dr. Kerlan, Defendants' expert witness. First, Plaintiff alleges that defense counsel improperly drafted Dr. Kerlan's expert report. Plaintiff asserts that Dr. Kerlan admitted on cross-examination that Dr. Kyker's attorney wrote his report and merely faxed it to him to sign. Thus, Plaintiff avers that Dr. Kerlan's opinions should be disqualified.

Under Federal Rule of 26, once it has been determined that an expert witness will testify within the meaning of Rule 26(a)(2)(B), the expert must submit a written report prepared and signed by the witness that contains the follows:

> a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

FED. R. CIV. PRO. 26(a)(2)(B) (emphasis added). In completing the written report, Rule 26(a)(2) contemplates that counsel may/will provide the expert with some assistance. In fact, the 1993

11

Committee Note states that "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness." Fed. R. Civ. P. 26 Committee Note (1993).

Several courts have addressed the permissible amount of attorney involvement in drafting an expert report. These courts conclude that as long as the substance of the opinions is from the expert, the attorney's involvement in the written expression of those opinions does not make them inadmissible. In <u>Manning v. Crockett</u>, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999), the court denied a motion to strike an expert based on the argument that he did not prepare the majority of his report himself. The court's approach recognized that "some attorney involvement in the preparation of an expert report is permissible" as long as the expert "substantially participate[s] in the preparation of his report."[4] The court summarized its approach by stating that "the assistance of counsel contemplated by Rule 26(a)(2)(B) is not synonymous with ghost-writing." <u>Id.</u>; <u>see also</u> <u>Trigon Ins. Co. v. United States</u>, 204 F.R.D. 277, 293 (E.D. Va. 2001). "Preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a) (2)(B)'s requirement that the expert 'prepare' the report. Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." <u>Id.</u> "Allowing an expert to sign a report

---

[4] <u>See</u> <u>also</u> <u>Bekaert Corp. v. City of Dyersburg</u>, 256 F.R.D. 573, 578 (W.D. Tenn. 2009) ("Thus, it is customary for an attorney to aid in the preparation of an expert report, since expert witnesses are likely to preoccupy themselves with their field of expertise, and . . . counsel may need to assist them in preparing a report that complies with the rules, as they may have little appreciation or none whatsoever for Rule 26 and its exacting requirements.") (internal quotations omitted); <u>In re Jackson Nat. Life Ins. Co. Premium Litigation</u>, 2000 WL 33654070, *1 (W.D. Mich. Feb.8, 2000) (holding that a report is not prepared by an expert when it fails to contain a single statement of expert opinion drafted from the experts own words).

drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule." Id. The party seeking to strike an expert's testimony has the burden of proving that the report was "ghost-written." Long Term Capital Holdings v. United States, 2003 WL 21269586, at *4 (D. Conn. May 6, 2003); Trigon, 204 F.R.D. at 295.

Here, Plaintiff's arguments concerning the alleged improper assistance by defense counsel in preparing Dr. Kerlan's report stem from Dr. Kerlan's testimony on cross-examination. Such testimony, in pertinent part, reads as follows:

Q:      Did you write that report.
A:      I did.
Q:      You wrote your report –
A:      No, I didn't personally write it.
Q:      -- in this case
Q:      Who wrote it?
A:      My attorney.
Q:      Your attorney wrote your report and then sent it to you?
A:      Right.
Q:      And you signed it?
A:      *No, no, no, no. Actually, we amended it. We reviewed it very carefully together for several hours and then submitted it.*
*Q:*      *But he wrote it?*
*A:*      *No, I provided the text. He provided an amended text. We reviewed it together, and then he submitted the final document.*

(Emphasis added). Given the entirety of Dr. Kerlan's testimony, the Court cannot hold that counsel's participation so exceeded the bounds of legitimate assistance as to negate the possibility that the expert actually prepared his own report. Thus, the Court sees no basis for concluding that Dr. Kerlan did not substantially participate in the preparation of his report.[5]

Second, Plaintiff alleges that cross-examination of Dr. Kerlan revealed that he was not familiar with the medical records at issue in the case. Plaintiff contends that "Dr. Kerlan refused to accept facts established by the medical records, such as that Bobby was experiencing atrial

---

[5] Given the Court's holding, the Court need not, at this point, address Defendants' arguments concerning Uniform Local Rule 26(a)(2)(A).

fibrillation at the time of the stroke." Dr. Kerlan testified that he was provided with all the pertinent records in order to allow him to render his opinions. And, contrary to Plaintiff's assertions, Dr. Kerlan was both familiar with the records and explicitly testified that he was "willing to accept that [LaFarge] was in atrial fibrillation [at the time of the stroke] based on the cardiology note." Dr. Kerlan consistently referenced the medical records and based his opinions concerning the standard of care on those very records. Thus, Plaintiff's arguments are to no avail.

Similarly, Plaintiff makes additional arguments concerning the reliability of Dr. Kerlan's opinions. These arguments are essentially the same arguments Plaintiff made in regards to Dr. Kyker's opinions, and Plaintiff's arguments here fail for similar reasons as discussed above. Dr. Kerlan was accepted by the Court, without objection from Plaintiff, as an expert in the field of electrophysiology based upon his background, training, and experience. Dr. Kerlan testified that, based upon his review of the medical records, Dr. Kyker correctly diagnosed LaFarge with atrial flutter with variable block on May 30, 2006; LaFarge was in sinus rhythm at the time of his heart catheterization; and Dr. Kyker properly exercised his medical judgment in recommending an atrial flutter ablation on May 31, 2006. Dr. Kerlan further testified that, based on his experience and a review of the medical records, Dr. Kyker appropriately held LaFarge's Coumadin and obtained a urology consult. Plaintiff provides no support for the Court to conclude that Dr. Kerlan's opinions were unreliable.

B.  Jury's Verdict on Informed Consent

Plaintiff contends that "a new trial is also warranted because the jury's verdict on informed consent evidenced flawed deliberations." Plaintiff avers that, based on the evidence,

the jury could not find that Dr. Kyker actually obtained informed consent from Angela Blizzard.[6] The Court disagrees.

"The doctrine of informed consent represents the application to medical practice of principles of tort law. Thus, when a lack of informed consent is claimed, the plaintiff has the burden to prove by a preponderance each element of the prima facie case: duty, breach of duty, proximate causation, and injury." Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So.2d 1346, 1363 (Miss. 1990). Regarding duty, the Mississippi Supreme Court has stated that "[w]hen a physician-patient relationship exists, the physician owes the patient a duty to inform and obtain consent with regard to the proposed treatment." Id. But "no doctor could comply with a requirement to disclose every possible risk to every procedure." Whittington v. Mason, 905 So. 2d 1261, 1266 (Miss. 2005). Therefore, the physician must disclose only "material known risks." Jamison v. Kilgore, 903 So. 2d 45, 48–49 (Miss. 2005) (quoting Reikes v. Martin, 471 So. 2d 385, 392 (Miss. 1985) (emphasis added)). A "known risk" is one "which would be known to a careful, skillful, diligent and prudent practitioner or specialist. . . ." Jamison, 903 So. 2d at 49 (quoting Reikes, 471 So. 2d at 392 n.3). "Once the known risks are enumerated, they can then be evaluated as to which are material." Jamison, 903 So.2d at 50. "[T]he physician may not be required to inform the patient of unexpected or immaterial risks." Palmer, 564 So. 2d at 1364. "Among the many factors which could weigh on the question of materiality are frequency of occurrence, potential severity or danger associated with the risk, and the cost and availability of an alternative procedure. **These factors cannot be established absent expert testimony.**" Whittington, 905 So. 2d at 1266 (emphasis added). "If a known risk is found to be material," and

---

[6] As background information, since LaFarge had received conscious sedation on May 31, 2006, Dr. Kyker was required to obtain informed consent through a relative. As such, Dr. Kyker contacted Angela Blizzard to obtain such consent.

was not disclosed to the patient, then "the question of causation must . . . be addressed." <u>Jamison</u>, 903 So. 2d at 50 (emphasis added).

As noted, "material known risks" must be disclosed. <u>Jamison</u>, 903 So. 2d at 48–49 (quoting <u>Reikes</u>, 471 So. 2d at 392). A "known" risk is one that is "known to a careful, skillful, diligent and prudent practitioner. . . ." <u>Jamison</u>, 903 So. 2d at 49 (quoting <u>Reikes</u>, 471 So. 2d at 392 n.3). "**[M]ateriality" must be established by expert testimony**. <u>Whittington</u>, 905 So. 2d at 1266. Only after it is established that the risk at issue is a "material known risk" does the analysis proceed to the causation inquiry of whether "a reasonable patient would have withheld consent had she been properly informed. . . ." <u>Palmer</u>, 564 So. 2d at 1364; <u>see</u> <u>also</u> <u>Jamison</u>, 903 So. 2d at 50.

As to causation, the plaintiff must further establish that "the treatment was the proximate cause of the worsened condition (i.e., injury)." <u>Palmer</u>, 564 So. 2d at 1364. Specifically, regarding causation, the Mississippi Supreme Court has held that there are two subelements:

> [f]irst, the plaintiff must show that a reasonable patient would have withheld consent had she been properly informed of the risks, alternatives, and so forth[7] . . . And second, the plaintiff must show that the treatment was the proximate cause of the worsened condition (i.e., injury). That is, the plaintiff must show that she would not have been injured had the appropriate standard of care been exercised. Generally, proof of the latter sub-element requires expert testimony that the defendant's conduct—not the patient's original illness or injury—led to the worsened condition.

<u>Palmer</u>, 564 So. 2d at 1364 (internal citation omitted).

To being with, the Court notes that Plaintiff presented no expert testimony establishing or suggesting that Dr. Kyker failed to meet the standard of care in obtaining informed consent for LaFarge's ablation procedure. <u>See</u> <u>Dunn v. Yager</u>, 58 So. 3d 1171 (Miss. 2011). Dr. Friedlander,

---

[7] This is an "objective test" centered upon "whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment." <u>Jamison</u>, 903 So. 2d at 48–49 (quoting <u>Reikes</u>, 471 So. 2d at 392).

Plaintiff's expert, conceded that he could not address the conversation regarding consent that occurred between Dr. Kyker and Angela Blizzard. Specifically, on cross-examination, when asked about Dr. Kyker's entry on the electrophysiology report wherein he stated that informed consent had been obtained, Dr. Friedlander testified as follows:

> Q:   . . . . I asked you at line 4 of the deposition that we looked at Dr. Kyker's EP study and he confirmed in the EP that he obtained Dr. Blizzard's informed consent, didn't he?
> A:   That's what he said, yes.
> Q:   And I asked you if you had any factual basis to dispute that, and you told me what?
> A:   I told you no, I do not.
> Q:   Yes, sir. Let's look at the last question. Would you agree with me, Dr. Friedlander, that having no factual evidence to speak to the issue of informed consent you are not and would not – let's go to the next page – be critical at trial of this case on the issue of informed consent? And what did you tell me?
> A:   I said yes.

Thus, Plaintiff presented *no* expert testimony to the jury that alleged a breach in the standard of care for informed consent in the present case.

However, Plaintiff asserts that Dr. Kyker admitted that he did not inform Angela Blizzard of the material risks related to the ablation procedure, including the risk of stroke. The trial testimony does not establish Plaintiff's otherwise unsupported contentions. First, Dr. Kyker testified that he met the standard of care as it relates to informed consent:

> Q:   Did you, Dr. Kyker, meet the standard of care in obtaining Dr. Blizzard's informed consent for the atrial flutter ablation procedure?
> A:   Yes, sir. I did.

Second, Dr. Kyker specifically testified that he informed Blizzard of the risk of stroke. To counter this argument, Plaintiff asserts that Dr. Kyker was obligated to inform Blizzard of an alleged "heightened" risk of a stroke. As noted above, Plaintiff presented no expert testimony establishing that the standard of care compelled Dr. Kyker to reveal such an alleged heightened

risk.[8]  Instead, what was established at trial is that Dr. Kyker needed to inform Blizzard of the risk of stroke. After hearing the evidence, the jury found that Dr. Kyker did indeed inform Blizzard of such risks and did not breach the applicable standard of care.

C.  Jury Instruction Number P-9

Plaintiff next asserts that the Court erred in not giving Plaintiff's proposed jury instruction "P-9."  Through this instruction, Plaintiff requested the Court to instruct the jury that the greater the danger, the greater the care that must be exercised.  First, Plaintiff's expert never once testified that Dr. Kyker had any type of increased or heightened duty in his treatment of LaFarge. Second, the only Mississippi authority that Plaintiff cited for the proposition that this instruction should have been given involved an action against a railroad for wrong death brought by a widow on behalf of her husband who sustained fatal injuries when he fell from a platform on which he was working while making repairs to the railroad's coal shute. See Ill. Central R.R. Co. v. Coussens, 77 So. 2d 818 (Miss. 1955). The case was brought under the Federal Employers' Liability Act. Id.[9] Third, the Court made clear during its jury instruction conference that it was not giving the proposed instruction because: (a) the negligence and reasonable man standard was addressed in other instructions, (b) the jury was already instructed on the dangers and risks concerning the treatment of LaFarge, and (c) the Court already specifically instructed the jury of the Plaintiff's case, the failures and omissions asserted, and what would constitute

_____

[8] While Plaintiff refers to an alleged heighted increase in stroke by 70%, as Defendants point out, the jury heard testimony from both Dr. Kyker and Dr. Kerlan that the 70% figure represented a relative reduction in risk over the period of one year for a patient, and not a reduction of risk on any particular date.

[9] See Pittman v. Steven, M.D., 613 S.E.2d 378, 380-81 (S.C. 2005) (holding that the proposed instruction stating that, the greater the risk of the condition to the patient, the greater the duty of the physician to respond appropriately and to provide the appropriate treatment was not warranted and noting that the instruction was highly "inappropriate" in a medical malpractice case); Hinkle v. Cleveland, 823 N.E.2d 945 (Ohio App. Ct. 2004) (holding that the trial court's failure to charge the "greater danger" instruction was not error in a medical malpractice case); but see Pannu v. Jacobson, 909 A.2d 178 (D.C. App. 2006).

negligence as applied to the facts alleged. Given all of the above, the Court concludes that a new trial is not warranted as there was no error in excluding P-9.

### D.  Whether Jury Verdict was Against the Overwhelming Weight of the Evidence

Plaintiff next contends that "[t]he evidence overwhelmingly support a verdict for the Plaintiff." After a methodical review of all the evidence presented, together with the Plaintiff's arguments and the trial transcript, the Court disagrees and finds that a reasonable jury could have reached a verdict in favor of the Defendants as to both informed consent and medical negligence. The Defendants presented to the jury testimony from three undisputedly qualified medical experts in their respective fields. As discussed in detail above, the testimony presented from each expert was legally sufficient and certainly not unreliable. Accordingly, for all of the reasons discussed *supra*, the Court finds sufficient evidence to support the verdict in this action.

### E.  Defendants' Motion for Sanctions

Based on an argument made in Plaintiff's motion, Defendants move for the imposition of sanctions under Federal Rule of Civil Procedure 11 and the Mississippi Litigation Accountability Act.[10] In Plaintiff's motion, Plaintiff asserts that counsel for Defendants improperly drafted Dr. Kerlan's expert report. Defendants contend that Plaintiff's counsel cited no case law from the Northern or Southern District of Mississippi, failed to cite or refer to the controlling local rule, and misrepresented to the Court the substance of Dr. Kerlan's trial testimony.

---

[10] Defendants initially moved for the imposition of sanctions based on two arguments made in Plaintiff's motion. In Plaintiff's motion, Plaintiff's counsel originally asserted that Dr. Kyker "testified that he did not know what the standard of care was." On August 11, 2011, pursuant to Federal Rule of Civil Procedure 11(2)(c), counsel for Defendants wrote Plaintiff's counsel advising that a motion for sanctions would be filed if the claims that were addressed in the proposed motions were not withdrawn within 21 days. In response to this, Plaintiff filed an amended motion that amended the portion of Plaintiff's memorandum stating that Dr. Kyker "testified that he did not know what the standard of care was." Given this, Defendants do not bring an action for sanctions based on this argument. Defendants' additional action for sanctions is discussed *infra*.

"Rule 11 places three duties on counsel: (1) counsel must make a reasonable inquiry into the factual basis of any pleading, motion, or other paper; (2) counsel must make a reasonable inquiry into the law; and (3) counsel must not sign a pleading, motion, or other paper intended to delay proceedings, harass another party, or increase the cost of litigation." St. Amant v. Bernard, 859 F.2d 379, 382 (5th Cir. 1988). "Rule 11 is violated if any of the above obligations are breached because each is an independent duty of a signing attorney." Thomas v. Capital Sec. Services, Inc., 812 F.2d 984, 988 (5th Cir. 1987). Similarly, the Mississippi Litigation Accountability Act allows the court to award reasonable attorneys' fees and costs against a party or attorney if the "attorney or party brought an action, or asserted any claim or defense, that is without substantial justification. . . ." MISS. CODE ANN. §11-55-5(1). For the purposes of the Act, the term "without substantial justification" means that "it is frivolous, groundless in fact or in law, or vexatious, as determined by the court." MISS. CODE ANN. §11-55-3.

Here, after reviewing Federal Rules of Civil Procedure 26 and 11, Local Rule 26(a)(2), and the parties' motions, the Court finds the imposition of sanctions to be unwarranted. Defendants' arguments to the contrary, Rule 26 it makes very clear that a party's expert designation "must be accompanied by a written report" that is "prepared and signed *by the witness.*" FED. R. CIV. P. 26(a)(2)(B) (emphasis added). While the Court has already concluded that counsel for Defendants did not violate Rule 26, finding that Defendants' counsel's participation in the preparation of Dr. Kerlan's report did not exceed the bounds of legitimate assistance, the Court is not persuaded that Plaintiff's motion concerning Dr. Kerlan's expert report was frivolous, meant to harass, or made without substantial justification. Therefore, sanctions are inappropriate, and Defendants' motion is denied.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Motion for Judgment as a Matter of Law, or, In the Alternative, for a New Trial is DENIED. Defendants' Motion for Sanctions, Attorneys' Fees, Costs and Expenses Against Plaintiff's Counsel is likewise DENIED.

So ordered on this, the ___12th_____ day of __December_____, 2011.


**/s/   Sharion Aycock_____**
**UNITED STATES DISTRICT JUDGE**